Good morning. May it please the Court, Phil Talmadge and John Neeleman here representing Global Enterprises. Your Honor, if I could, I'd like to reserve three minutes of rebuttal time for that as a target. Good to see you again, Judge Gould. The district court here, in our view, prematurely dismissed on summary judgment Global's legal malpractice and breach of fiduciary duty claims against the Montgomery Purdue law firm despite the existence of clear factual issues in a circumstance where there were intensely factual questions to be determined. I think critical to this Court's analysis are several points that bear emphasis. The first is that the two pieces of litigation that are critical here, the Evia case and the Stabbert case, were, according to the state court, significantly related. They were related litigation. And this plays into the question about conflict of interest, whether the matters are substantially related. The underlying case which resulted in the $8.4 million judgment, Global was a defendant itself and the management firm that was dealing with the charter vessel or vessels was separate but in the lawsuit. And my understanding is that Montgomery Purdue represented management? It did. It represented MMSI. And that the Bower Moynihan firm represented Global? That's correct, with one additional fact, and that is the Montgomery Purdue firm represented a Global employee, Joaquin Paraschia, in that for paying the judgment. It agreed to indemnify MMSI. So there was no conflict of interest despite that being given as an ostensible reason for the Bower Moynihan firm deciding not to participate in the representation of Global. And you had also the fact that you had this related litigation, the Stabbert litigation that arose out of the same chartering of the vessel. In the lawsuit, the underlying suit we're concerned with, which as I understand it proceeded in state court, is there any doubt who was responsible for the error that resulted in the judgment? Well, I think that would be a question that would come up in the course of the trial of the malpractice claim. But it's pretty clear that we had a responsibility of filing the expert report in a timely fashion. Well, it looked like it was Bower Moynihan, but you also had the circumstance where you had a team effort, you had Montgomery Purdue's lawyer intimately involved in the issues. And this is our contention with respect to the peripheral duty concept, where there was an attorney-client relationship. You don't get to whistle past the graveyard when you see obvious circumstances of malpractice like this, where... Responsible for locating and identifying the expert damage witness, wasn't it? That's what we're talking about? Well, this was initially undertaken by Mr. Crane, but let me point out again, under Washington law, under Mazone, that's an undivided duty of loyalty to the client, that there's an obligation to basically both have a responsibility to fully present and articulate the theory on behalf of the client. I'm not trying to dispute your arguments on theory. I'm just trying to get a couple of things clear. Sure. A lawyer from the Bower firm was responsible for identifying the damage expert and filing a timely report, correct? He undertook that responsibility. And that did not happen? It did not happen. But I should point out that Mr. Gosler also had a responsibility to have an expert witness on damages with respect to MMSI that was not fulfilled under these terms. Correcto. What you have here is a question that really, in terms of the legal malpractice, boils down to the question of, is there an attorney-client relationship? And under Washington law, under a trio of cases of the Washington Supreme Court, starting with McLaughlin, Bowen versus Cody, and then lastly, the Dietz versus Doe case, it's a question of fact. Did the client subjectively believe that the client had an attorney-client relationship and was that understanding objectively reasonable? There are all sorts of circumstances as we've pointed out to the court here, under the totality of circumstances approach, to suggest that Mr. Stewart could legitimately believe, first of all, he said subjectively he believed that Montgomery Purdue was his lawyer in this litigation. But in addition, that was something that would be objectively reasonable, or at least an issue for the trier of fact to determine. Prior to the litigation, there was a conflict waiver sign, wasn't there? There was. And what did that concern? Well, I think it was the perceived potential conflict that Bower Moynihan believed existed in these circumstances. Ultimately, that proved to be a fallacy. How it, what it proved to be, I'm not interested in. There was a written document executed prior to the litigation beginning in which the Bower firm asked Global and Global agreed that there had to be separate representation in the lawsuit, correct? I don't know if it was, I don't know if it was Global agreeing to that, Your Honor, but there was a conflict that was waived, whatever that potential conflict was. By Global. By Global. By Global and by MMSI, I should point out. Both signed that document. Okay. And during the proceeding, the Bower firm represented Global, questioned witnesses on behalf of MMSI, and from time to time, the Moynihan firm was allowed to separately question witnesses about the concerns of its client at the time. Well, there were, there were additional factors involved, Your Honor. There were... Is what I just said accurate? What you said is accurate. It is indeed. But let me, let me point out that there are... Tell me, you can tell me why it's not important. I just trying to nail down the facts. No, I understand. And you, you're correct about that, Your Honor. But also in this circumstance, there were communications that were had between Montgomery Purdue and Global with respect to discerning whether or not there was a RICO claim, for example. A very significant issue in the case. And individualized communications between Mr. Gosler of Montgomery Purdue and Frank Stewart of Global about a whole array of issues. Claims, like I just talked about RICO, other kinds of involvements in the handling of the case, and ultimately... Wasn't there a joint defense agreement? There was a joint defense agreement. What was the purpose of that? Well, it was an undertaking... Why would you have it, why would you have a joint defense agreement if they were just all, all in this just together? Well, because these lawyers... It sounds, when you ask for a joint defense agreement, it means that a client is represented by a separate lawyer. Well, the, the other thing... And therefore, you're going to combine your resources, you're going to work together on a share information, and you're going to... And, and this is on the basis, Your Honor, of that initial misperception that a conflict of interest existed. Well, what difference does that make? Well, it, it goes to the question of whether the client's belief about whether or not there was an attorney-client relationship is objectively reasonable. And let me point out as well, with respect to the joint defense agreement, it was overtaken by circumstances in the case. You have the joint defense agreement, you then have the representation of Global in the Stabbert case, you have the representation of Global's employee, Joaquin Paraschia, in Evia. Well, the employee, he, he was barely in the case. He was a named defendant, and then they dismissed, he was not served, and he was dismissed out. But he was nevertheless Global's employee, so this notion that there was no objectively reasonable basis upon which Mr. Stewart could believe that there was an attorney-client relationship is undercut by that. Was he dismissed out before the defense agreement was, was signed? I believe he was dismissed out after, after the joint defense agreement was signed. He was never served, right? I think that's correct, yes. The point, the point I'm getting at is these issues are intensely factual in nature, and, I might point out, under Washington law, whether or not you have a written agreement, whether you have a theory, a relationship, or any of those issues, is not conclusive as to the relationship. McLaughlin says that, Bowen v. Cody says that, and Dietz says that. So the fact that there are these written agreements that we're talking about, they are fact points. They're certainly fact points that Montgomery Purdue gets to raise in defense of the claims brought against them, but they are not conclusive under Washington law, and you have to look to the totality of the circumstances in the case as to whether or not it's objectively reasonable for Mr. Stewart to believe that there was an attorney-client relationship. He's getting individualized legal advice about, does his company have a RICO claim? He's working closely in the trial of the case with Mr. Gossner, and there's no question that post-trial, post-judgment, Mr. Gossner takes over responsibility for the discussion of settlement and the resolution of those, the attempted resolution of issues. That was after the judgment had been entered, correct? It's after the judgment's been entered, but I think it's, notwithstanding that fact, it's still a significant point as to whether Mr. Stewart objectively, could objectively reasonably believe that he had this relationship with Montgomery Purdue. The final thing... Mr. Thomas, let me ask this. Could global reasonably be perceived as having a lawyer relationship in this case with Montgomery Purdue when it has an explicit counsel agreement with the other firm? Maybe Washington law is permissive enough for that. It is permissive enough for that, Your Honor. I think that's perhaps what... Well, I think that's the significant point of the Bowen case, Bowen v. Cody, is that the existence of a written agreement, a written engagement agreement, is not conclusive as to the objective reasonableness of the perceived client's belief that an attorney-client relationship exists. So the fact that we have this attorney-client engagement letter is between Montgomery Purdue and Global with respect to Stabbert, with respect to Pereskia. It didn't have an engagement letter, I might add, with MSI in the Evia case. That is not... None of those are conclusive. There are fact points, but they're not conclusive in terms of this relationship. And ultimately, what the Court, I think, has to look to here is all of the totality of the circumstances that we've outlined in the brief that suggest that Mr. Stewart's belief was reasonably achieved to believe that an attorney-client relationship existed. On top of it, you have this whole notion of the concept of peripheral duty that we've talked about in terms of the JTS case, and we've cited treatise authority on this point. There's no question in this case but that there is an attorney-client relationship here between Global and Montgomery Purdue. They're representing Global in the Stabbert case. They're representing Global's employee in the Evia case. So these are not an alien relationship. They have an attorney-client relationship. Do they get to stand idly by, whistling past the graveyard as I've said, when they see obvious malpractice being committed by counsel in the case? Under their theory of the case, no. They can basically blithely move along and not have to worry about that one little bit, notwithstanding the obvious malpractice of failing to timely provide an expert witness on damages, a really critical aspect of the case. This is a side... I mean, your time is running out, but just as a side matter, I'm just kind of curious. Did Global ever bring any litigation against Bauer Moynihan? It did. And that case settled. Okay. Let me conclude by pointing out with respect to one other intensely factual issue, and that is the limitation of representation under RPC 1.2c. You have the Taylor v. Bell case that holds under Washington law that this concept of limiting or unbundling services by a lawyer is something that cannot be done easily. It's something that is an intensely factual point. In that case, the court found that there was a question of fact as to whether or not it was appropriate for a Seattle counsel to have attempted to unbundle its responsibilities for understanding and complying with Idaho law. It's no different here. You have related cases. You have Montgomery Purdue representing an EVIA... excuse me, a Global employee in EVIA, representing Global itself in the Stabbard case, these related cases, and it's attempting through the device of these engagement letters and so forth to limit the scope of its responsibilities to Global. It doesn't get to do that without carefully and clearly delineating the lines. The other factual point you have in support of the proposition that there's a question of fact on RPC 1.2c, as well as the existence of the attorney-client relationship, is expert testimony in this case that indicates that this was a circumstance that was reasonable for Mr. Stewart to have believed that an attorney-client relationship existed and that Montgomery Purdue inappropriately failed to limit its services as is required by RPC 1.2. It didn't get the informed consent of Global. It didn't delineate to Global the precise nature of the multiple relationships it had with it, and from that failure to delineate the responsibilities, it was easy for a lay client to believe that an attorney-client relationship existed and therefore the district court prematurely dismissed the malpractice claim as well as the breach of fiduciary duty claim. Thank you. Thank you, Mr. Talmadge. Okay, now for the defendant. Good morning. May it please the Court. My name is Richard Simpson. It's my privilege to represent Montgomery Purdue, Blankenship and Austin. This case presents a kind of nightmare scenario for lawyers that is taught about in continuing legal education classes all the time. What happened here is that the lawyers did the right things to make sure that nightmare didn't apply. The nightmare is a lawyer is involved in a matter and then when it's over, someone the lawyer did not represent says, oh, I thought you were my lawyer. I subjectively believed you were my lawyer. You don't want that to end up in a situation where the lawyer says one thing and the client says another. The way the CLEs tell you to avoid that is to document what you're doing. Document who you represent. That's exactly what the documents and the lawyers. This is not a case where strangers were foisted upon each other or where the appellants here are trying to foist a representation. The Montgomery firm had represented Global before the AYA case, correct? I don't believe they had represented Global before. I believe they had represented Marine Management. Global entities, employees, whatever, and they represented Global after the case in a related case. Yes, they did not represent Global before, but then another case was filed and in that case Montgomery Purdue undertook the representation of Global. And when the failure to disclose timely a damage expert occurred, they stepped in to try to repair the damage for lack of a better description, correct? I wouldn't put it that way. They were joined in the effort to try to repair the damage? Well, what happened was, and whether there was malpractice in connection with that report is disputed and hasn't been decided, but it's alleged and so we'll take it as true at this stage. I didn't describe it as that. I just said at the point in time where a timely report was not filed, thereafter lawyers from the Montgomery firm participated in trying to repair the damage. No, I wouldn't put it that way. How would you put it? This came up at a trial at which both law firms were participating on behalf of different clients and so the Bauer firm was participating on behalf of Global and as the questioning earlier indicated, the Bauer firm was responsible for that report. Montgomery Purdue, Mr. Gosler, is participating in trial for a different client from Marine Management, but with a joint defense agreement, so working together. When the judge said, I'm not going to admit, you have a choice basically, she said, I'll either give a continuance and we have to resume a long time down the road or you can't use this witness for that purpose, a decision had to be made and the Bauer firm, the lawyers for Global, sat down with Mr. Stewart and Global and made the decision to not offer the testimony. Mr. Gosler, on behalf of Montgomery, was aware of the discussions and at trial and discussing because his client, the co-defendant, also had an interest in that. I hope that describes it clearly. The point is that it came up in the course of a trial, both firms are there representing different clients. But everyone was aware at the end of the day, if there was an adverse verdict, who would have to pay it? There was an indemnification agreement and so . . . Montgomery firm was aware of that? They were aware of the indemnification agreement and they were aware that there . . . it went both ways depending on whose responsibility it was and they were aware there was an oral statement by Mr. Stewart that he would indemnify, yes. As I was saying, the way that lawyers can avoid these problems, because fortunately a subjective belief by a person that someone is their lawyer isn't enough. Here it certainly can be found there was no subjective belief, but fortunately that's not enough. It has to be objectively reasonable. That's where you document what's happening. Some of this has come out already in the questioning, but if you look at it, each step of the way is documented. At the outset, it's the Bauer firm that says we have a potential conflict. And so we want a separate counsel for marine management. That's the Bauer firm reaching that conclusion. It's the right thing to do if you think there's a potential conflict. And there was a potential conflict. It doesn't really matter to the analysis here, but there was because the Bauer firm had been involved in giving advice to Global about this underlying charter. And its advice had not been taken. And Global wanted to terminate because of unsafe diving conditions. Bauer said you can't do it. They wanted to terminate because of no insurance. Bauer said you can't do it. They came up with another reason to terminate. There was an issue of whether attorney-client privilege would be waived. And if it were waived, the Bauer firm would have to give testimony that was very damaging to Global, and marine management could very well want to distance itself from that. Likewise, marine management wanted separate counsel. That's in the record also. So there's nothing wrong with the Bauer firm saying we think a separate firm should be representing marine management. That's what happens. You get a written waiver of conflict. They both sign. It says Bauer is representing Global and Montgomery-Purdue is representing marine. You have a joint defense agreement. It sets out who is representing who, and it says we're going to cooperate. It's a classic joint defense agreement. As Judge Paez pointed out, you don't need that if both lawyers are representing the same client. You need that if you've got co-defendants with different lawyers. There's a memo from the Bauer firm to Mr. Stewart explaining how the joint defense agreement works and what will be privileged and what will not be privileged. When Montgomery-Purdue undertook to represent an employee of Global, this person who was never served, it did a retention letter, and it said very clearly exactly what it should say to Global, to Mr. Stewart. It said our client will be the employee. It will not be Global. Global is paying the bills, but the client is not Global. It is the employee. Counsel, if I could interject a question. So how do you view the state of Washington law as to how permissive or not permissive it is in letting, considering the written agreements, but also considering the intent of Global's CEO and his personal relations with Montgomery-Purdue? The law says that for a lawyer-client relationship, a written agreement isn't required. If there is a written agreement, it's given great weight in determining the scope. As far as an attorney-client relationship with no written agreement, again, it has to be subjective belief that the lawyer is acting as a lawyer, and it has to be objectionably reasonable. You can't come in after the fact. Why here is it inconceivable that it's objectively reasonable in light of the other relationships between Montgomery and the company's executives? Because the documents are clear, and as Judge Zille pointed out, there's absolutely nothing that can be pointed to reasonably to suggest that this could have been the belief. As I said, the formal documents, all the way through the retainer agreements, and if you look at the retainer agreement, I was about to mention when Montgomery-Purdue began to represent Global in the Stappert case, a separate case, it says, scope of services, we shall act as counsel for Global Explorer, LLC, Global Enterprises, LLC, and yourself, Mr. Stewart, in defending the claims by Richard Stappert and Global Marine Logistics, LLC, against you in the complaint filed in King County Superior Court under case number and the number. What could be more clear than that? And that is not a limited scope engagement. Can you just clarify one thing on that Richard Stappert versus Global case? Yes. That was in King County Superior Court, and that was pending about the same time as the Evia case was pending against Global and MMSI. Yes. They were sort of similar tracks. The Stappert case was filed four or five months later than the Evia case. But they were moving along. Yes. Yes. They were both pending at the same time. And Montgomery-Purdue was representing Global in that Richard Stappert case, right? Yes. Yes. And during the course of the litigation involving Evia, Evia's case, the lawyer for Montgomery-Purdue had direct conversations with, I forget what his name is from Global. Mr. Stewart. Mr. Stewart, about the Stappert case. The Richard Stappert case. Yes. Yes. And at times they would also discuss how the two cases were linked. Very very little. Well, if you look at the documents that are cited in the long footnote in the other side's brief, there are only two or three emails that, before the settlement negotiations, after judgment, which are relevant under Washington law, there are two or three emails that reference both. And so, for example, I think it's at 144 of the excerpts of record, there's an email the is Mr. Gosler talking about both cases together. If you look at that, the red line is Richard Stappert case, his case. And it says, we filed motions in the cases, in both cases last week. And it goes on, it says, let me just make sure I have the exact language here, we filed it in both cases on behalf of Trevor and MMSI in the Evia case and on behalf of Global in the Richard Stappert case. So even in these informal communications, he's careful to delineate. Is there any evidence that, because he had this attorney-client relationship with Global, that when he was conversing with Stewart, Gosling was conversing with Stewart, is there any evidence along the way that Stewart either asked for advice directly from Gosling about the Evia case or Gosling offered advice directly to Stewart about the Evia case? No, or no other than there were joint defense communications at their trial together. Well, yeah, but I'm talking about sort of, you know, there's an attorney-client relationship between Montgomery Stewart and Global in the Stafford case. So I mean, you could see a client talking to his lawyers, well, you know, the lawyers also involved in this other case, and just, you know, asking questions, is there any evidence of that? No. No, nothing outside. What about this? What do you think about this? No, nothing outside the joint defense. Where are we going with this? And nothing outside the joint defense context which you would expect where both co-defendants are working together, and that's a key point, that there was no confusion here, no confusion in the record or otherwise about who represented who. The first time Mr. Stewart or anybody ever suggested that Montgomery Purdue, that Mr. was when they were looking for another pocket for reasons that are described in our papers, not all of which are public. That's when it came up, and if you look at the contemporary documents, they show conclusively that Global knew that its lawyer was Bower Moynihan, and it knew there was separate representation. Even in the appeal, in the underlying case, after everything had happened, and after Mr. Stewart knew everything he knows today, absolutely everything he knows today about what his objective belief was, what was said during the trial, and everything else, Lane Powell filed an represented. That's what everyone understood, and in fact, one document that's mentioned in our brief, but perhaps should be emphasized more than we did, it's at SCR 51. This again is after trial, and it's an email from Mr. Stewart to Lane Powell asking about the appeal, what's going to happen in the appeal. Lane Powell was brought in for the appeal. And so if he thought that Global was his lawyer, he would have known it then. He's asking questions. What does Mr. Stewart ask? This is at 51. Have you sorted out Gosler's role in the appeal, Gosler being from Montgomery, Purdue? Is separate representation needed for marine management services? He knows it's been separate to that point. If not, I would certainly like to merge his appeal, Gosler's appeal, with ours, Global's. And what does Lane Powell say in response? It says the same lawyers could represent both because there is no conflict. However, the only qualification is that in the past, Global has not insisted on fully controlling the defense, and marine maritime management may stand on precedent and insist its counsel be involved. And so right there, after everything has happened, you've got both Mr. Stewart and his lawyers saying marine may insist its lawyer be involved. And you have Mr. Stewart saying, can we merge his appeal, marine's, with mine? Your honors, we respectfully submit here that this is the case that those continuing legal education sessions talk about, where you document what happens, and you document who's representing who, so that you don't end up in a situation where someone can credibly say, I thought you were my lawyer. I see my time is up. If I could just make- You're actually over your time. I'm sorry then. Unless there are any questions, your honors, we would respectfully request that the judgment be affirmed. Thank you, counsel. I have none. Thank you, your honor. Briefly on rebuttal. Question of fact as to the existence of attorney-client relationship under Washington law deets. Question of fact as to limitation of representation under Taylor. Both significant. In response to your question, Judge Gould, totality of circumstances, the McLaughlin case makes it clear that the existence of an engagement agreement is not dispositive on the issue of attorney-client relationship under Washington law. So Mr. Talmadge, would it be your position that this issue of whether there's an attorney-client relationship with Montgomery Purdue could go to a jury under proper jury instructions saying there would have to be both a subjective intent and it would have to be reasonable? Absolutely. That's what Washington law requires, your honor. And then in response to your question, Judge Paez, I think Mr. Simpson misspoke. Mr. Gosler gave specific advice during the representation by Montgomery Purdue of MMSI and EVIA to Global, the same time it was representing Global with respect to Stabbert, regarding RICO claims that Global might have in that litigation, in the EVIA litigation. He was giving specific advice. Was he giving advice to both his client, I mean to jointly? Only to Mr. Stewart. Only to Mr. Stewart about the RICO issue, the existence of a RICO claim. That's indicative of how this issue was handled here. For counsel to stand up and say... What point in the litigation did he make that? Well, it was during the course of the EVIA litigation and I believe it was after the filing of the Stabbert case in which, in fact, Montgomery Purdue had Global as a client. So for him to stand up and say, this is a circumstance where someone, you know, a situation where someone the lawyer did not represent is involved, Global was represented by Montgomery Purdue. We know that. And to say, well, we really should delineate these circumstances in a more appropriate way. Indeed. That's what informed consent is all about. Mr. Stewart did not have conformed consent. At no point do you have a delineation of these multiple representations by Montgomery Purdue of Global as to what the responsibilities and the actual relationships were. And in fact, on the ground, in the litigation, you had Mr. Gosler assuming more and more and more of a direct responsibility for Global's interests. Counsel, I don't mean to interrupt, but we've taken you a couple of minutes over your time and we let both counsel go over time a bit because we understand the importance of the case. But I'll bring it to a conclusion. Thank you, Your Honor. I want to thank both counsel, this distinguished Seattle counsel here makes me a little homesick for law practice. Thank you. Kathy, let's say on the record that Global Enterprises v. Blankenship, 1435841 and 3-5-10-15-35026 shall be submitted. Then we'll turn to the last case on our argument calendar today.
judges: Hawkins, Gould, Paez